SERVICE LLOYDS INSURANCE COMPANY, Appellant,

v.

**Douglas BOWSER, Appellee.**

**No. 2–90–140–CV.**

Court of Appeals of Texas, Fort Worth.

Aug. 18, 1992.

Rehearing Overruled Sept. 30, 1992.

Guittard, Hyden & Guittard, P.C., Clarence A. Guittard, E. Thomas Bishop, P.C., E. Thomas Bishop and Darryl J. Silvera, Dallas, for appellant.

Haynes and Boone, David E. Keltner and Craig M. Price, Brookman & Baird, Thomas H. Brookman, Jr. and Robin Brookman Baird, Fort Worth, for appellee.

Before WEAVER, C.J., and LATTIMORE and DAY, JJ.

## OPINION

LATTIMORE, Justice.

In this workers' compensation case, Service Lloyds Insurance Company appeals from a judgment rendered on a jury verdict finding that Douglas Bowser was totally and permanently incapacitated on two occasions, beginning on October 10, 1988, and January 25, 1989. The principal question on appeal is whether direct medical evidence is the only competent evidence to prove the amount or percentage that the prior injuries contributed to Bowser's total and permanent incapacity in 1989. *See* former TEX.REV.CIV.STAT.ANN. art. 8306, § 12c.[1] Because we conclude that other forms of evidence may prove the amounts of contribution, and we find some evidence of these amounts, we reverse and remand for a new trial.

Service Lloyds, the workers' compensation insurance carrier, has assigned fifteen points of error. Because we sustain its third point of error, we will address only that point and the fourth, sixth, and eighth points of error.

The jury made two separate findings that Bowser was totally and permanently disabled: one for occupational disease man-

---

1. Act of Mar. 28, 1917, 35th Leg., R.S., ch. 103, § 12c, 1917 Tex.Gen.Laws 269, 278, *amended by* Act approved June 8, 1985, 69th Leg., R.S., ch. 326, § 2, 1985 Tex.Gen.Laws 1387, 1388, *re-pealed by* Act approved Dec. 13, 1989, 71st Leg., 2nd C.S., ch. 1, § 16.01, 1989 Tex.Gen.Laws 1, 114.

ifested on October 10, 1988, as the result of repetitious, physically traumatic activities; and one for an accidental injury on January 25, 1989. Service Lloyds submitted a proposed jury question to the trial court asking the jury to find what percent, if any, of the total and permanent incapacity was caused by a 1986 injury, the 1988 injury, and the 1989 injury. The trial court refused to submit an issue on contribution.

In order to reduce its financial liability pursuant to former article 8306, section 12, the insurer was required to prove: (1) the claimant suffered a previous compensable injury; (2) the previous injury contributed to the present incapacity; and (3) the amount or percentage of such contribution. *See Transport Ins. Co. v. Mabra*, 487 S.W.2d 704, 707 (Tex.1972). Bowser claims that even if there is evidence to support a finding that the prior compensable injuries contributed to his 1989 incapacity, there is no evidence to support a jury finding of the percentages of contribution that each injury made to the 1989 incapacity.

In order to determine if the trial court erred in refusing to submit the issue on contribution, we must review the record to determine whether there is any evidence of the amount or percentage of contribution that each of the injuries made to Bowser's incapacity in January 1989. If there is some evidence to support a jury finding of percentage of incapacity caused by each of the three injuries, the trial court erred in refusing to submit the proposed jury question. *See Brown v. Goldstein*, 685 S.W.2d 640, 641 (Tex.1985).

In 1982, Bowser went to work at Charlie Hillard Ford (Hillard) as a new and used car salesman. In 1984, he worked for Hillard as a body and frame repairman. In 1986, he began work as an estimator for Hillard. In August or September 1986, while working as an estimator, Bowser hurt his back lifting a tire into a truck, and filed a workers' compensation claim in connection with that injury. At the time of this initial injury in August or September of 1986, Bowser went to a hospital emergency room, was released, and returned to work the next day. He was treated with pain medication and muscle relaxants for lower back pain and numbness of his right thigh by F. Melvin Johnson, M.D. Bowser saw Dr. Johnson for this problem, diagnosed as "myositis of back," on October 27, 1986; additionally, Dr. Johnson examined Bowser on January 15, April 10, May 9, May 28, June 27, July 21, August 12, September 21, and December 24, of 1987. X-rays of Bowser's lumbar spine and hips were negative in September of 1987.

In July of 1987, Bowser went back to work in the body shop at Hillard, where he continued employment until he stopped working in January of 1989.

In January of 1988, Bowser was hospitalized for meningitis, subsequently had brain surgery and was off work in March, April, and May 1988 recovering from the brain surgery.

In May of 1988, after returning to work, Bowser found that the pulling, tugging, and dragging related to his work made his back worse. He began seeing Thomas R. Turner, D.O. for his back problems on May 23, 1988. Turner's notes indicate that Bowser had been suffering from pain in his back and lower hips since he was injured lifting a tire in September of 1986, had not seen a doctor for this problem since 1986, and that the condition had worsened in the previous two or three weeks. A CT scan was made of the lumbar spine in late May of 1988, and on June 1, 1988, Turner informed Bowser of the results of the scan—a disc bulge at the L4–L5 level, which displaced the left L5 nerve root in the rear. On September 30, 1988, Turner took X-rays and a myelogram of the lumbar spine. The X-rays were negative, but the myelogram indicated a central and left L4–L5 extradural defect. Turner diagnosed Bowser's condition as a herniated disc after the CT scan, and that diagnosis remained throughout his treatment.

Beginning on June 1, 1988, Turner began treating Bowser with pain medication. Turner prescribed narcotic pain medication for Bowser throughout the balance of 1988 and into 1989, on the following dates: June 1 and 15; July 5, 13, 15, and 21; August 1; September 14, 27, and 30; October 12, 17,

and 26; November 4, 10, 14, 16 and 25; December 2, 12, 19, and 27; and January 3 and 13 in 1989.

Dr. Turner's October and November notes indicate that he repeatedly warned Bowser against taking the pain medication in large quantities, or while working or driving; that Bowser said he had to work; that Bowser reinjured his back working on a truck at Hillard's; and that Bowser had pain at L-5, diffuse pain in the lower portion of the lumbar back, and radiating pain in back of both hips. Turner advised Bowser to have surgery. Turner refused to refill the pain medication several times, and after the last refusal in late January, Bowser began to see another physician.

In Turner's opinion, Bowser had a pre-existing injury dating back to September 1986, which he aggravated in May of 1988. Additionally, Bowser's amended claim for the 1988 repetitious trauma injury indicates that lifting a tire (the September 1986 injury) caused the initial injury which led, ultimately, to the jury's finding of total and permanent incapacity commencing on October 10, 1988. Also, Bowser executed a medical authorization on October 14, 1988, listing the date of the accident as "9/2/86 repetitious trauma."

On October 10, 1988, Bowser called in to work saying he would be late. He left work early that day. According to his testimony, he told his supervisor, Ken Eagleton, that his back was hurting him due to the work.[2] Bowser said he continued to work and make excellent wages until January 25, 1989, because he had two small children, was buying a home that he did not want to lose, and he had already been off work three months due to meningitis and brain surgery. He did not believe he could have worked without the pain medication.

Bowser's wife testified that the 1986 injury was not significant, but that his back began hurting in May of 1988 after he returned to work. The condition worsened between May and September or October; Bowser began to limp and have trouble bending.

According to Bowser's testimony, on January 25, 1989, he was repairing the roof of an ambulance when he fell from his make-shift platform and landed against a drum, leaving his back in severe pain.[3] His supervisor had Bowser driven to a local emergency room, and Bowser never returned to work.[4] He was seen in the emergency room and released that day. Two days later, he called Dr. Turner for more pain medication, and Turner refused.

On January 31, 1989, Bowser began to see Warren D. Wilson, M.D., the neurological surgeon who had performed the brain surgery the previous year. Bowser told Wilson about the accident on January 25th and his back problems from the previous year, although he did not fully explain the extent of the problems and course of treatment. At that time, Bowser was showing a range of motion decreased to one-third normal, with straight leg raising leading to back and hip pain at about sixty degrees. Wilson prescribed a narcotic pain reliever and muscle relaxant. On February 3, 1989, Wilson ordered a myelogram, which confirmed that there was mild bulging at L4–L5, suggesting a disc herniation, and there was mild symmetrical narrowing of the L5–S1 foramina. Wilson stated that Bowser's fall while working on the ambulance was the final precipitating event causing his disability. He concluded Bowser's condition was permanent in the absence of the recommended surgery, that the condition was worsening, that Bowser was in pain even at rest, and that he could not do any type of physical activity. Wilson last saw Bowser on September 28, 1989, and Bowser

2. Eagleton contradicted this testimony, and evidence showed that Bowser was "written up" for an unexcused absence on October 10th.

3. Bowser's testimony was contradicted by his fellow workers, who never heard or saw him fall, and by his supervisor, Eagleton, who did not notice Bowser do anything to indicate he

suffered from back pain, other than to report the accident and go to the hospital.

4. Eagleton explained that Bowser was terminated from employment because this was the only way to preserve his insurance while he was not working.

was continuing to receive pain medication from him.

Dr. Wilson further testified: all objective findings were consistent with a ruptured disc at L4–L5 by September 30, 1988, at the latest; the findings were consistent with something that occurred as early as May 1988; and it was not necessary that there be any injury on October 10th or January 25th for Bowser to have his present complaints of pain. However, there could be intervals with no pain when Bowser could go about his normal activities, then the pain would be precipitated again. Wilson concluded the injuries were probably disabling when Dr. Turner was treating Bowser.

Bowser testified that the accident in January made the pain worse, and now it was too painful to work. At the time of trial, he did not think he could do any work for eight hours a day, as his back had been bad ever since the fall. His wife testified that he had severe pain ever since the January accident, and his back had not improved over time.

The jury found that Bowser was totally and permanently incapacitated beginning on October 10, 1988, as a result of repetitious trauma occupational disease and that he was also totally and permanently incapacitated as a result of the January 25, 1989, injury.

■ Service Lloyds argues that the trial court should have submitted its proposed question on contribution because there was some evidence of the percentage or amount that the prior injuries contributed to Bowser's total and permanent incapacity arising out of the January 1989 accident. Bowser agrees that there was evidence that prior compensable injuries contributed to his total and permanent incapacity. However, Bowser asserts that the trial court correctly refused to charge the jury on contribution, as there was no direct medical evidence of the amount or percentage that the prior injuries contributed to his incapacity. Bowser relies on *Wilson v. Klein Indep. School Dist.*, 817 S.W.2d 371, 374–76 (Tex.App.—Houston [1st Dist.] 1991), *rev'd per curiam*, 834 S.W.2d 3

(Tex.1992); *Transamerica Ins. Co. v. Hernandez*, 769 S.W.2d 608, 611 (Tex.App.—Corpus Christi 1989, writ denied); *Texas Employers' Ins. Ass'n v. Gomez*, 756 S.W.2d 80, 81 (Tex.App.—El Paso 1988, no writ); and *Charter Oak Fire Ins. Co. v. Barrett*, 655 S.W.2d 333, 338 (Tex.App.—San Antonio 1983, no writ). In each of these cases, the appellate court stated that, in the absence of direct medical testimony on percentage or amount, there was *no* evidence of the amount of contribution. None of these cases gave any rationale for the statement.

Service Lloyds relies on *Lumbermens Mut. Cas. Co. v. Martinez*, 763 S.W.2d 621, 622 (Tex.App.—Eastland 1989, writ denied), where the appellate court did not require direct medical testimony about an amount or percentage of contribution, although one doctor had opined that the claimant was 100% disabled before the injury in question. Service Lloyds also refers us to *Texas Employers' Ins. Ass'n v. Etheredge*, 154 Tex. 1, 272 S.W.2d 869, 877 (1954). Although *Etheredge* predates the *Mabra* opinion, and was based on a previous version of the contribution statute, we believe the holding in that case has bearing on our present determination. In *Etheredge*, the question was the amount of contribution that the claimant's noncompensable tuberculosis made to his compensable silicosis. The insurer's expert physician testified there was no silicosis, only tuberculosis. The claimant's expert physician testified the tuberculosis was only moderate, and was probably attributable to long-standing silicosis. Apparently, both silicosis and tuberculosis produced similar objective symptoms. The supreme court concluded that this testimony was some evidence from which the jury should have been able to determine percentage or amount of contribution tuberculosis made to the incapacity. *Id.*

Service Lloyds also relies on a case out of our court, which we conclude controls our determination in this matter: *Royal Globe Ins. Co. v. Suson*, 626 S.W.2d 161, 162–65 (Tex.App.—Fort Worth 1981, writ ref'd n.r.e.). Suson suffered a compensable back injury in 1976 when he fell from a

boxcar, and missed seven months of work. He returned to work as a forklift operator, and although he suffered severe leg and back pain thereafter, he was able to perform his duties as a forklift operator until he was transferred to an assembly line in January of 1979. He worked as an assembler until January 1980 when he felt something pop in his back while putting a trunk lid on a car. Suson's 1980 injury was diagnosed as ruptured disc, and he eventually had a spinal laminectomy and fusion. His treating physician testified that the pre-existing back problems were probably a contributing factor to the 1980 incapacity and that perhaps the 1980 injury was an aggravation of the earlier problems. There was no direct expert medical evidence of amount or percentage of contribution. The insurer appealed from the jury's finding of total and permanent incapacity, and Suson filed cross-points alleging there was no evidence to support submission of the jury issue asking the extent to which the 1976 injury had contributed to his incapacity. Our court concluded that there was some evidence to support submission of the question regarding the extent of contribution, despite the fact that there was no direct medical testimony showing the amount or percentage of contribution that the prior injury made to the later total and permanent incapacity.[5] *Id.* at 165.

We have not been able to determine any rationale for concluding that there must be direct medical testimony regarding the amount or percentage of contribution. Surely, in some cases where the claimant is able to return to his prior working capacity after an injury and sometime later he sustains another injury, there may be insufficient indication of the amount of contribution. In the case at bar, the amount of contribution the 1986 injury made to the 1988 and 1989 total and permanent incapacity findings is not as clear as the amount of contribution the 1988 injury made to the

1989 incapacity. However, the evidence in this case is overwhelming that the 1988 repetitive trauma injury was a major factor in causing the 1989 total and permanent incapacity. The 1988 injury was diagnosed as a ruptured disc at L4–L5, as was the 1989 injury. The objective and subjective symptoms were the same, except after the 1989 injury the symptoms and pain were more severe. The injuries were just three months apart, with no apparent abatement in pain between October 10, 1988, and January 25, 1989. Bowser was able to continue working while taking pain medication until the January accident; however, such working due to economic necessity does not necessarily show that he was not totally incapacitated by October 10th. Finally, the jury finding, supported by the evidence, that Bowser was totally and permanently incapacitated on October 10th, is a strong indication that the jury could, in the instant case, assign a percentage to the amount of contribution the 1988 injury made to Bowser's total and permanent incapacity of 1989.

Although the correlation of the 1986 injury to the subsequent injuries is not as clear as is the correlation between the 1988 and 1989 injury, by Bowser's own admission it was a part of the repetitious trauma which led to his incapacity in 1988, and the specialist who treated him in 1988 believed it to be the first of the traumas leading to the 1988 incapacity. We conclude that this evidence, coupled with the evidence set out more fully above, is at least some evidence of the amount of contribution made by the 1986 injury.

◼ Finally, we note that, *even if* direct expert medical testimony is necessary to provide *sufficient* evidence of percentage of contribution, in the instant case, there is at least *some* evidence of more than a scintilla of amount of contribution, albeit circumstantial evidence. *Compare Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d

---

5. It is interesting to note that Suson's brief, taken from our warehoused files, raised precisely the same issue as the issue in the present case. He claimed that there was no evidence of amount of contribution, citing *Hartford Accident & Indemnity Co. v. Contreras,* 498 S.W.2d

419 (Tex.Civ.App.—Houston [1st Dist.] 1973, writ ref'd n.r.e.) and *Millers Mut. Fire Ins. Co. v. Monroe,* 495 S.W.2d 625 (Tex.Civ.App.—Waco 1973, writ ref'd n.r.e.). See discussion of these cases in *Wilson,* 817 S.W.2d at 375.

1, 12 (Tex.1991) (holding that unsegregated evidence of attorney's fees is at least some evidence of the segregated amounts). We conclude that evidence showing the combined effects of the prior and present injuries is at least some evidence of the proportion or amount of effect that each injury caused. Because there was some evidence of the amount of contribution the 1986, 1988, and 1989 injuries made to Bowser's incapacity after the 1989 accident, the trial court erred in refusing to submit Service Lloyds' proposed question inquiring about contribution. The third point of error is sustained.

■ In its fourth point of error, Service Lloyds claims there is no evidence to support the jury finding that the first distinct manifestation of the repetitious trauma occupational disease occurred on October 10, 1988.

In determining a "no evidence" point, we are to consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidence and inferences to the contrary. *See Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex.1988) (per curiam); *Larson v. Cook Consultants, Inc.,* 690 S.W.2d 567, 568 (Tex.1985); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951) (per curiam). If there is any evidence of probative force to support the finding of the jury, the point must be overruled and the finding upheld. *In re King's Estate,* 244 S.W.2d at 661–62.

A "no evidence" point of error must and may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Commonwealth Lloyd's Ins. Co. v. Thomas,* 678 S.W.2d 278, 288 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.); Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX.L.REV. 361 (1960).

The overwhelming evidence shows that Bowser had a herniated disc and was in pain prior to October 10, 1988, and evidence shows a gradually worsening condition between May and October of 1988. There is evidence that the herniated disc was not conclusively shown until the myelogram of September 30, 1988, and that Bowser was informed of the results shortly thereafter. Bowser missed time from work in October due to his back hurting, and he believed that it was on October 10, 1988. Documentary evidence shows that he did miss work on part of that date. Bowser testified that this injury was beginning to be disabling on October 10, 1988.

We hold that this is some evidence that October 10, 1988, was the date on which Bowser, as a reasonable man, first recognized the seriousness of his repetitious trauma injury. It may be that the time period of the first distinct manifestation of a gradually disabling condition consists of a period of several months rather than a certain date, because the injury, work-related nature, and seriousness of the injury often become apparent only over a lengthy period of time. *See Commercial Ins. Co. v. Smith,* 596 S.W.2d 661, 664–65 (Tex.Civ. App.—Fort Worth, 1980, writ ref'd n.r.e.). Because the jury finding that the first distinct manifestation of the repetitious trauma claim was on October 10, 1988, is supported by some evidence, we overrule the fourth point of error.

■ In its sixth and eighth points of error, Service Lloyds contends that there is no evidence that Bowser gave Hillard notice of his repetitious trauma occupational disease of October 10, 1988, within thirty days of its first distinct manifestation. Bowser testified that he informed his supervisor of this worsening work-related back pain in the last part of September, and that the supervisor was aware that he had to have a myelogram. Bowser also testified that he informed his supervisor that his back was hurting from the work on about October 10, 1988. We hold that this is some evidence that Bowser gave notice of his repetitious trauma occupational disease within thirty days of its first distinct

manifestation, and overrule the sixth and eighth points of error.

Because we conclude that the trial court's error in refusing to submit Service Lloyds' requested question on contribution was reasonably calculated to and probably did cause rendition of an improper judgment, we reverse such and remand this cause for a new trial. *See* TEX.R.APP.P. 81(b)(1).